Our next case is in Re Tarasenko, 19-1453. Mr. Farr, you have reserved your time, you've reserved three minutes for rebuttal. You may begin, sir. May it please the court. The examiner's final rejection in this appeal is a rejection of the claims as being directed to non-patentable subject matter under Section 101. The examiner's final rejection was erroneous and should be reversed for at least two reasons. First, the claimed invention, as properly understood, is directed to an improved method of delivering transit time information rather than any abstract idea of determining that transit time information. So you would agree that Claim 3 is directed to looking up transit times? We agree that Claim 3 recites the step of looking up transit time information. Why is that not abstract? Well, that is not the invention. During the prosecution and the rejection, it was agreed that that was a prior art step. Just stepping back and going to the first step and trying to determine what the claims are directed to. Yes. And you agree that Claim 3 is directed to looking up transit times? Well, it recites the step of looking up transit time information. My question to you is why is that not an abstract idea? Just the idea of looking up a transit time. We agree that looking up or calculating the transit time information can be an abstract idea. For example, one could claim that they had an improved method of utilizing weather information or traffic in calculating the transit time information. And therefore, they have an improved method of doing that and looking up and calculating that transit time information. It's clear here that that's not what Claim 3 is directed to. When that step is recited of looking up the transit time information, it's a predictory step so that we have antecedent basis for limitations that appear later in the claim. So if the Claim 3, for example, recited a method of providing transit time information comprising receiving weather information, receiving transit information, looking up transit schedules, and calculating therefrom a transit time information, then the claim would be directed towards an abstract idea. But aren't you just describing just fundamental logistical inquiries? The claims do not. In the technical limitations, the claims do not. In the Step 1 of the ALICE analysis, you look at the invention as it is claimed and what the inventors claim to have contributed. It's hard to claim anything without having some predictory steps or some predictory acknowledged prior art limitations. And I think the key, of course, is to identify what is the abstract idea, and that's a difficult thing to do. That's why I think I contrast Claim 3 as it is in the appeal with the one that I just recited, which would be an example, and I think that's very close to the example of St. Bilski, where the invention and the contribution made by the inventors was in the nature of an algorithm or an abstract idea. How do we better calculate this or look this up? And I think there's a little bit of confusion because patent officers say that we admit that that's abstract. We're just trying to illustrate for the court what I think is the dividing line between the abstract idea of our claims and what the invention is. There is no claim, and there never has been in any of the claims, starting from the original claims, an improved method of calculating that transit time information. The claims are directed to how you best deliver that information between technical systems from one party to the other. And that was the basis for our claims, and that's what we assert that the invention is. What limitations specifically would you point us to in Claim 3 for what you're contending is the technical improvement of communicating that information? There's a combination of limitations that distinguish over the prior art method, which we acknowledge in the specification was having a server serving a website. You would go to that website, log in, and obtain the information. Our invention utilizes a web services interface that is part of an online logistics system, which receives requests from an ERP system, processes those requests by calculating or looking up transit time information in a database, and then returning a response back to the ERP system. It is the online logistics system, which has that web services interface. So having a separate entity to provide the lookup time? Well, I think the main feature is the web services interface. And you'll see that there's also limitations which, again, contrast with the conventional method of using a server. That's the classic Alice test. This is something which is conventional. You do it on the Internet via computer. That's correct. But we don't do that. We have a very specific online logistics system. And the web services interface itself is very specific, using a new technology that had only recently been introduced. But is that in the claim? Yes. Yes, it is. The claims are out to the ‑‑ It's providing the second step of providing a web services interface to said online logistics system, which is separate from a basic HTTP authentication. Said web services interface requiring that web service requests include a client credential parameter, which is different than any parameter used by the basic HTTP authentication. So that makes it clear that this is not a traditional web server that uses HTTP for delivering the transit time information. That web services interface has to receive a web service request from an ERP system and then return the answer to that request to the ERP system. Now, the other part of this that is new is that ERP systems did not previously have this ability to issue web service requests. We in the invention, as part of the invention, say that the ERP system should be modified to be able to deliver those web service requests. In the appendix to the application. Can you tell us what is advantageous about the ERP system? The ERP system, utilizing the ERP system, is a system that traditionally stores and maintains information relating to inventory levels, warehouse usage, supply chain information, manufacturing resources. Yeah, so a lot of a lot of organizations will have that, particularly manufacturers. But they don't have anything related to a way to get transit time information into that system. The conventional method was to have a human being go somehow get that transit information, either by calling or perhaps looking it up on a website, getting that information and then inputting that into the ERP system. This system allows that to occur automatically by virtue of these web service requests. So there is an advantage that it does not require human interaction. There's an advantage that it happens instantaneously. There's an advantage that the information relating to the transit time information, it does not have to be in the ERP system. It can be in the online logistics system. And then when the web service request arrives, it simply looks up that information and returns it. The part of this is, even though I hope I've explained that to your satisfaction, it's not quite that easy to do in practice. Web services were only developed in approximately 2004. The effective priority date of this application is February 10, 2005. So getting on to step two of ALICE, the web services interface in no way is a well-known routine or conventional technical system. The problem I'm having with the claim, and I want to make sure you're able to respond to what I'm going to tell you, is that the phrase web service interface doesn't really account for those technical difficulties that were encountered. You know, it's more of a blank box description, a claim. If you can tell me why I'm wrong. Well, no, it is a reference to web services. And this is, I think, the tricky part is web services were prior art. And we refer to that prior art. And so you can look up, for example, what you have to provide for that web services interface. And it's in the appendix to the application containing an example of a web services interface with the code. It's unusual to provide that, but it was provided on pages 120 to 122 of the appendix. You have that specific implementation of a web services interface for this application, because it relates to transit time information. You can use web services for, you know, movie schedules, all kinds of information. That would require a slightly different interface in terms of the fields and the formats of the information that's being exchanged. Now, just because web services were previously known in prior art does not mean that they were well-known, routine, and conventional. Mr. Bauer, you're into your rebuttal time. You can continue, or you can reserve it if you like. You can answer Judge Stoll's question. Let me just finish the question. So we argue that there's a different legal standard for well-known, routine, and conventional. It's more than just prior art. And the time interval is obviously insufficient for that technology to have become well-known, routine, and conventional in the span of one year. It obviously does not happen that quick. Thank you. Mr. Foreman. Thank you, Mayor. Please, the Court. With regard to the abstract idea in this claim, the claim simply recites a method of providing transit time information upon request. Nothing more, nothing less. It's the same idea as me calling someone up and saying, how long is it going to take to send a shipment from Chicago to New York? That person looking up the answer in a book and giving me the response. That's all the claim says. What if the abstract idea were defined – or not the abstract, excuse me. What if what the claim is directed to is defined a little bit more narrowly than that? Not just to be the idea of looking up transit time, but also looking up transit time using different – a carrier database and a web services interface, different computer components or interfaces. Does that change your view? No. Whether it's directed to something that's abstract. No, because it's merely – the computer here is merely the tool used to implement the abstract ideas. In my example, the tool to implement the abstract idea would be a telephone. They said – appellant said in the prior art they used an HTTP server. Here, the claim just recites using a web services interface as the tool to accomplish the abstract idea. What about the argument that that web services interface was something that was pretty novel and there were some difficulties that would come with inventing this particular claim dimension? How do you respond to that? In other words, there was some technical ingenuity involved here in the implementation of the idea. I understand that argument, but I think that the specification contradicts that argument. Specifically, if you look at appendix page 106 of the specification, it says that the use of a web services interface according to the preferred embodiments makes the support requirements rather minimal. The shipper system merely needs to be able to make the appropriate web service calls. These may be any of the remote procedure calls already known to those in the art, or maybe some other type of call. So if this was such a novel and difficult system to implement, you would expect something other than that statement in the specification, that the support requirements are rather minimal, and that any procedure call known in the art would work here. In a way, you're saying the claim is more directed to the idea of automating the providing of transit time information? Correct. I think their allegation is that providing transit time information via a web services interface is quicker and more efficient than how it was provided in the past, and simply automating something or making something more efficient is not enough to get around 101. So the automating itself is part of the abstract idea? Is that what you're saying? No, I think the abstract idea is just the idea of providing the transit time information upon request. I'm saying that in the step two analysis, the use of the web services interface is merely the use of conventional technology, and their goal here, and I think they state this in their brief, was the use of the web services technology would improve the speed of providing this information. And that's not enough. Just saying getting an improved speed or efficiency of providing information is not enough to get around 101, because otherwise, any method of doing something over on a computer versus doing it with a paper and pencil would satisfy 101. If there's nothing further? No, thank you. Thank you. Back to you in three minutes. Thank you, Your Honor. With respect to the modification of the ERP system to interact with this system, it's not conventional to do that. It's not even known to do that. The web services interface is not conventional technology. We had to develop it, and it's attached as the appendix to the application. And it says that any computer system wants to interact with this interface, this is how you interact with it. So this is like I've given you a keyhole. Any key you provided that fits the keyhole would work. We don't care anything else. This is how we define it. Okay, so it's not conventional in that sense. There's no web services interface that has ever existed for this application. Also, the claims do not recite, for example, a method, simply a method for providing transit time information, which does not require human interaction. It doesn't say that. It's more specific than that. And so it's not an abstract idea because you can only infringe this claim by doing the very specific steps that are recited in the claims. There's no protection of any algorithm. There's no protection of any calculation of the transit time information. What is being protected by the claim is this specific way of attaining these advantages. Finally, one point I also wanted to say on the reliance on conventional technology that pervades the arguments, that begs the question that's raised with Raising Berkheimer, what's the difference between being prior art and being well-known, routine, and conventional? They are not the same. It has to be something more than prior art. Now, when a technology gets introduced, in this case web services, and it's in the process of being standardized, you'll notice that the appendix B that appears from the board is dated after our priority date. When it's that fresh, what you have here is a group of inventors who are utilizing those new technologies for a new application. And there is a single application that is here, which is providing transit time information. That also falls under step two, where we're being very specific about how these technologies are being used, and nothing except these specific technologies, which we contend are not conventional. We realize there's not a lot of jurisprudence on this particular standard, but we should make clear, and I hope the court does in this case, that it's not really conventional simply because it exists, and it's been standardized to try to encourage its adoption. We thank you, Mr. Bowe, for your time.